Case 14-3094, 15-4020, 15-4021, Allied Erecting v. Service Transportation Board et al. Oral argument is not to exceed 15 minutes for the petitioners, and 15 minutes will be shared by the respondents and interveners. Mr. Streeter for the petitioners. May it please the Court, I would like to reserve three minutes of rebuttal, please. These cases boil down to the Board's unchallenged statement that if Ohio Central never obtained any operating authority from the ICC or the Board, then none of Allied's state law claims could be preempted. Once the Board correctly determined that, and that is not challenged, the Board should have simply closed the books, sent it down to the state court, and said you're free to decide the case. Instead, they didn't. They engaged in... Can you repeat the first sentence that you said again? There was a lot there, and I want to make sure I understand the point. Boils down to? Boils down to the fact that if Ohio Central never obtained any operating authority to operate over Allied's tracks, then none of Allied's state law claims could be preempted. As a result... Wait, you're saying that you can avoid jurisdiction just by not filing? Who's trying to avoid jurisdiction? No, I'm saying, maybe I'm not understanding what you just... Are you saying that once it was determined that they didn't file? They didn't have authority to operate. Since 1920, the Interstate Commerce Act, as originally enacted, said before you could hold out transportation for hire, you had to go to the Interstate Commerce Commission and get a certificate of public convenience and necessity to operate over an extended line of railroad. Now, they took the position before the state court that we have a certificate from the Interstate Commerce Commission that was issued back in 1982. Ohio Central? Ohio Central, or Mahoning Valley. The way it works is Mahoning Valley is part of Ohio Central, so it's been mixed up since the very beginning. Why don't we call them Mahoning for this argument? Let's just call them Mahoning. All right, Mahoning. Standard term. All right, Mahoning, in 1981, went to the Interstate Commerce Commission and asked for authority to serve, as it turns out, a line of track that starts off 300 feet east of the Center Street Bridge in Youngstown, goes on the north side of the Mahoning River to hit the Campbell Works, and then it crosses over to the east to go into Struthers. That did not give them any authority to operate over Republic Steel tracks, which are on the south side. Right, okay. All right, so at some point, the only way that Mahoning was able to ever operate over Allied's tracks or LTV tracks after LTV acquired Republic through merger was to get another certificate unless it operated under the lease. The lease has the requirement that all of the operations that were to be handled on behalf of LTV were to be lawful. That's at appendix page 319. At 321, it further limits. It says, your service is to be provided for LTV's tubular plant in Youngstown, Ohio. They started operating, and they operated fine. My client, Allied, bought those tracks in 1993. It had no problem with the original Mahoning Valley operations. It was only after Mahoning Valley was sold to a couple of operators that all of a sudden, they decided that, hey, we can provide whatever service we want. And they simply began providing it. The only problem with that is without a certificate of public convenience necessity from the ICC or the STB, those operations were unlawful. If I may just interject, and that's, I mean, this has all been very helpful. As I understand the board's response or the government's response here, they're saying that may well be true, but it's beside the point solely its own. Let's call that interstate commerce or something. And authorized or not, Mahoning was doing that. Mahoning wasn't moving supplies within its own facility or something. It was moving goods in commerce. And the board, per what I understand is called the use doctrine, says anytime somebody's doing that on a rail, we have jurisdiction. And if that weren't the rule, then rogue operators would be able to do all kinds of things, and we wouldn't be able to stop them. Is the use doctrine a valid doctrine, and does it apply here? Your Honor, I have been practicing since 1971. I started off with general counsel of the Interstate Commerce Commission. I have never known that to be the case. There is no statutory authority whatsoever for the board to simply don blinders to the fact that there is no operating authority. Go back to their main point. If there is no operating authority, this case is over. They should have sent it back to the state court for consideration of the state law trespass issues. If I could just close this out real quick. Let's say they find out that some operator, without any authorization, is all of a sudden using a track. I guess somebody's letting them do it. They're using the track. They've got no authorization to do this. Is it your position that the board would not have jurisdiction to act? They could act. There is a civil penalty for that. What would be the basis of the board's jurisdiction? The board has jurisdiction if somebody is operating illegally to step in and seek remedies to prohibit it. What statutory or doctrinal basis? I'm driving at, is it the same basis they're asserting? In that hypo, what is the basis of the board's jurisdiction? Presumably it's a statute or a regulation? It's part of the act itself. What section? This is a jurisdictional section. 11901C, I believe it is. I cited it in our opening brief. 10501? 11901. 11901. Let me double-check that real quick. Okay. I'll take that as an answer, and I will step aside because I know others have questions. Talking about that jurisdiction issue, I'm not sure exactly what the argument is. Are you saying that, or in your case, you're saying it's your property, somebody is operating a rail on it beyond their authority? We're saying two things. Number one, this track was built by Republic Steel back around the turn of the 19th century. It was never intended to be used for for hire operation, and this gets into the problem that we have with Mr. Spiker's testimony. That is of record. They just decided not to look at it. Mr. Spiker's testimony makes it very clear, and if you look at the very detailed map, which I had a hard time getting to you, that's at page 462, it shows the old 1962, the facilities of Republic Steel. It is a maze of track, and the reason we used spur, industrials, whatever, these were the type of tracks within the Republic Steel facility. They were not used for interstate commerce purposes, though. They were used to help take iron ore to the blast furnaces, take the stuff to the rolling mill, to the tubular mill, whatever. They then took it to a set-out track where it was put into the B&O, the Pennsylvania Railroad, etc. They never allowed it. That track was sold to LTV. It was then sold to my client. My client is not a railroad. It doesn't want to have anything to do with the railroad industry. It wants those tracks to be able to reclimate the property that it had bought from Republic Steel. When these guys started parking cars just randomly, it made it impossible for him to even use the tracks that he had bought. When he bought it, he did it solely, he granted the easement solely so that the railroad could continue to provide a very limited service to LTV's plant that is just west of the Center Street Bridge. I mean, the state court didn't read it that way. The board apparently didn't read it that way. I mean, I don't think we're here to construe the easement. But I think that your characterization is disputed here. Well, it may well be. But the problem is, if you look at the last part, which they never mention in their brief, it says to LTV, LTV agreed that if its operations interfered with Allies, they would either get out of the business of using the track or whatever. LTV is no longer around. Not the current people that own Ohio Central. It's a different group. The group that originally acquired it is the one that started this process. And my client didn't know what was going on. It didn't ask for bills of lading every time a car went by to find out what was going on. Why can't the board help you out? I mean, I understand the problem you're describing. It sounds pretty bad. These guys are slobs. They're leaving this stuff around. It's got corrosive material, etc. Why not ask the board to help you out with this? We did. We asked the board to please send this thing back to the state court. Well, no. That's not what you know. Come on. All right. I'm saying, why not ask the board to take substantive action on your behalf? Well, we could have filed a complaint. Now, part of the problem... Why are you so eager to go to state court, I guess? As opposed to... I mean, the board, as I read, I think it was the number two decision. They seem to intimate they're ready to help you out with this, perhaps. I mean, this is all about jurisdiction. Why are you so... The way I read it is that they're saying to me that, hey, you called it this, and this is part of 10906 track. I never mentioned 10906 track. I never mentioned auxiliary in the original pleading. Now, part of the problem is that the original pleadings were actually generated in the state court proceeding where I played literally no role at all. But I don't view the board's action as trying to help my client protect his property rights at all. And there is, in the absence of a certificate, they're not there properly. Under 10906, even if you can say that, oh, yeah, you can provide it, you've got to have some authorized line of railroad. There is none. So, I'm sorry, it's... The board said that this is mainline track, correct? Am I getting the term right? Yes. Okay. That is right. I mean, as a procedural matter, your petition doesn't say this is private track. It says it's spurs and ancillary and all this stuff that mirrors the language of, you know, the section I'm referring to. That was close. And so the board understands your argument, as I understand the board's decision in their first case. They understand your argument to be that you're arguing it's ancillary track as opposed to mainline track. And then the board makes their decision and says that they don't have to actually reach that question between mainline track and ancillary track because Mahoning was authorized in 1982. And you come forward and say there's no way that can happen because they weren't even around or something until 1984, okay? But throughout this time, you are not telling the board, my argument is private track. And it's only, like, you know, years into this. It was 16 months, I think, after you filed your petition for rehearing that you tell the board it's private track. No. Isn't that fair? What's wrong with that? I want to understand if that narrative is wrong. That is not fair. If you look, even go back, you're talking about the April. You never said private track, correct? Wrong. Did you use the word private track? Go back to September the 30th. Okay. In that pleading. Of what year? Of 2014. In that pleading alone, I referred to these as private tracks 29 different times. So it is totally false for the board to claim that I never claimed they were private. But that's pretty recent. It's recent, yes, but keep in mind, the first from 2009 to 2013, we waited for a decision. Then they came out and they found that, oh, hey, boys, we've discovered they have authority. All right. So at that point, the whole game starts all over. And that's one reason I feel that they made a fatal error when they refused to look at Mr. Spiker's. They used... Spiker leaves the employ of Mahoning or whatever that company was, okay? It changes hands. He was the original. But what he did is... But he leaves the employ in 2001, right? Until 2001. He's done... 1981 to 2001. Right. He set the stage and he told the board what was going on, how it was being operated. It wasn't being operated as for hire operations. It was being used to provide switching services, which are not... You don't need a certificate for that type of service. So all of a sudden, 2001, the new owners, Summit et al., take over. They changed the style of what's going on. My client didn't realize it. And it just continued. But the bottom line is that the board, there is no statutory authority that allows the board out of thin air to say, oh, these are unlawful operations, you've done it for years, and by golly, you can continue to do it. We don't care how much damage it does to the owner of the tracks. Okay. Well, this is about jurisdiction, not about propriety. But I think that's a good point. We're in the red zone here. Unless one of my colleagues... Just to follow up on something. So what was under consideration from 2009 to 2013? They were trying to find the application, I guess. That's what they say. They say their staff looked high and low and couldn't find it. They finally found this questionnaire. When I looked at the questionnaire, I looked at, wait a minute, that's wrong. What they're talking about is to the north. That's when I went and I represented about several of the railroads in that area. And I said, who was it that used to work for the Mahoning Valley who can give me a straight reading and corroborate what I have said? And they said, oh, call up Mr. Spiker. Well, who filled out that application? The original attorney for LTV, not LTV, for Jones and Laughlin. It was a firm out of Detroit. He's retired now somewhere out in Arizona. And they did it. And when you look, we don't have the actual application, but if you look at the articles of incorporation, et cetera, you could see that Jones and Laughlin did not operate south of the Mahoning River. And that's what finally triggered my realization that, wait a minute, this authority has nothing to do with Republic tracks. Okay. Let's hear from the Board, I guess, right, first. May it please the Court, my name is Eric Light. I'm an attorney with the Surface Transportation Board here on behalf of the Board in the United States. With me today is Mr. Eric Hockey, representing the intervener, Mahoning. And I'll be taking 12, and Mr. Hockey will be taking three minutes. This Court has before it three decisions from two separate Board proceedings. And they're separate cases before the Board, and they have separate records. Allied tries to make this case seem more complicated than we really think it is. He's now talking about preemption. Really, the fact is that there's one fundamental issue here, which is the Board's determination that these tracks were within its jurisdiction and were not private tracks. So the issue before the Court is whether that determination was reasonable. Now, before going into explaining why it was reasonable,  if the tracks are private tracks, that means that Allied can essentially use its tracks as it wants, consistent with state law. If, however, before you get sort of more specific, I really want to understand, because I do think Mr. Streeter has challenged it, what is the statutory basis for the Board's jurisdiction over, I guess, everything that isn't what you call private tracks? Well, the statute provides the Board jurisdiction over rail lines. I mean, I want section numbers. It's 10901. 10901? That gives the Board jurisdiction over rail lines. 501 or 901? Sorry, 10901. 10901. Right, and 10902 deal with rail lines. Okay. And 10906 involves ancillary track, which is spur industrial sidetrack. And that provision is a little confusing because it provides that the Board has jurisdiction over these types of tracks, but it doesn't have regulatory authority. It doesn't regulate their entry or exit from the system, but they're still under the Board's jurisdiction. Right, I understand. And you say, does 901 use this term mainline track? No, it uses the term rail line. And so rail line can be either mainlines or branch lines. Branch lines are less used. But they're not ancillary. They're not ancillary, correct. Okay. And I also understand that you seem to be pegging jurisdiction on the usage of the track. And at some point in your argument, please explain where that doctrine comes from and how it connects with these sections. But anyway, I sort of interposed, so I'll step back then. And if, however, the tracks are under the Board's jurisdiction, then certain regulatory requirements kick in, and they can have an effect on how a party uses its property under state law. But my point today is that the various regulatory requirements and the implications they might have are not at issue and were not at issue before the Board. The only thing that was at issue is whether or not these tracks are within the Board's jurisdiction. And the Board has relied on a test for many years. The case we cited is called B. Willis from the early 2000s, where the Board looks at the use of the tracks to determine whether or not they are jurisdictional tracks or whether they're private tracks. And under that test, as Your Honor basically said, the Board looks at whether or not the owner of the tracks is using the tracks to move its own goods or if it's holding out to provide service to the public generally for compensation. If it's the latter, then they're within the Board's jurisdiction. If the former, then they're private track. Okay, but the argument is not directed at that. It's directed at the fact that, okay, maybe there's a little bit of use that goes beyond solely relating to the owner's material, but it wasn't authorized. They're saying it wasn't authorized and they didn't know about it, and in fact they want to stop it. And the Board has never taken the position, Your Honor, that unauthorized use removes the tracks from the Board's jurisdiction. We cited the case of the JGB Properties case. That was a case where a landowner had tracks running across his property to a warehouse, and it asked the Board for a declaratory order to declare that the lines were unauthorized rail lines. And in the alternative, it said if the lines are authorized, please construe this petition as a request for abandonment. And the Board in that case said it didn't have to decide what the status of the lines were, but if it were unauthorized rail line, then you would have to file an abandonment application. The importance of that, Your Honor, is that you only file for abandonment for tracks that are within the Board's jurisdiction. Well, I mean, citing Board opinions is sort of like citing District Court opinions. You know, we're here to review the Board's decision. And so what is the statutory or circuit case law basis for saying what you've just said, which is the Board has jurisdiction over any railway that is used in a certain manner, regardless of whether the use is authorized? Trace that for me through the, really I'm more interested in circuit case law, and ultimately to whatever statutory section supports this idea. Well, Allied cites the Seventh Circuit's decision in Wisconsin Central, and it cites it for the proposition that if a rail carrier operates private track, then if it operates private track under a lease, then the operator becomes subject to the Board's jurisdiction but not the tracks. We think, however, that actually the Seventh Circuit supports our position because what the Court also said in that case was that if an abandoned rail line will remain outside of the Board's jurisdiction unless the owner of the line uses it to provide rail service. And that's what happened here, Your Honor. In 2001... The Seventh Circuit said what the abandoned line... It was actually quoting a Board decision, but it was quoting it favorably. Right, yeah. Yeah, and so what happened here was in 2001 Mahoney... Because I don't feel like I understand sort of the statutory regime, and we're just diving into this Board case and this doctrine. It's like, well, Congress had something to do at some point with what we're talking about, I gather. And so what statutory provision supports this use doctrine idea that seems to be the linchpin of your argument? Well, Your Honor, I think it's simply that the Board is interpreting the terms of the statute, like rail line and ancillary track, what are those things? Okay. And so the Board has... In which section, what? Are we talking 901? In 901, yeah, right. So this is an interpretation of rail line? Well, I mean, I think when the Board came up with the use test to distinguish between jurisdictional track and private track, it didn't specifically cite 10901 or 10906, but those are the only types of track that are within the Board's jurisdiction. Is private track a term used in the statute? No, Your Honor. So you're just saying stuff that's not recited in the statute, we're calling that private track? Right, right. Okay. So the Board's trying to figure out what is within its jurisdiction, and the only thing that's in its jurisdiction... The tests get enunciated in context. And so if you're looking at how various track is being used, it makes sense to ask those questions. I mean, is it solely for the landowner? Is it through traffic? I mean, all of that makes sense. But were those cases decided in a context where someone is arguing, whoa, you can't take jurisdiction over my track when you've got a rogue operation here that's completely unauthorized, nobody has their certificate, and someone's just doing something on the property. Don't take jurisdiction, just stop it. Well, there are cases. We cited, for example, the Suffolk and Southern case, which is a Board decision. The what case? It's called Suffolk and Southern. It's a Board case where somebody started building a rail facility out in New York, and they had operation, it was a railroad, had operations in Ohio. And the Board stopped them from doing that because it was not like ancillary to the operations in Ohio. So it had to have separate authorization. So the Board, yes, the Board stepped in in that case and said, you cannot do that, you cannot build without our... Okay, but under what? Did it do it under the statutory authority that counsel cited earlier, or did it say... You need to get authority to construct a rail line if you're a railroad. You need authority to construct an additional rail line under 10901. And they didn't get that authority, and they needed it. So that was a case where they tried to bring something into the system, and the Board said, no, you can't do that. Is there a particular reason the Board is wary of state court involvement here? No, Your Honor. So it wouldn't be fair to say this is a jurisdiction grab by the Board? No, I don't think so, because nothing the Board said prevents allied, I'm sorry, from going back to state court and trying to adjudicate its state law property rights. Now, what those effects might be, they might have to come back to the Board and argue about that, and then the Board decision would, of course, be subject to review. If this track has been used as either main line or ancillary track, but let's say the Board made findings that at one point there was cargo moving through. So let's say it turns out that the railroad that did that never had authority, which apparently they didn't. Can the Board force the landowner to let the use continue? Let's say that track is somehow important to serving somebody down the line. Can the Board say, well, it's too bad, you know, maybe they weren't authorized, but right now what we're going to do, because it's important to interstate commerce, we're going to authorize it, and it's too bad that you let them do it when they didn't have authority, but this is the status quo now, so we're authorizing it. Well, generally there are two things you need in order to provide service. You need authorization from the Board, and you need the appropriate state law property right or contractual right. If the Board gives a party regulatory authority to operate, that doesn't necessarily confer upon that party the necessary state law property right. They have to go out and get it. Now, this case is a little different because the operations started no later. I mean, I think there's some dispute in the record, but at least since 2001, when they obtained the LTV easement, they had a property interest, and they didn't have, like you say, they didn't have Board authorization. So what we would do in this case is if they came in and said, please authorize this, we might grant after-the-fact authorization, so they would have both of those elements at that point. I'm not sure if that answers your question. Okay, but you would leave it to the state to determine the scope of the easement or not? Well, yes, the state court would determine the scope of the easement, and as your question, what would happen if the state court found that there was no easement, like the easement terminated, is that the question? Yeah. In that case, Your Honor, I think the parties would probably come back to the Board because the Board's decision here was premised on the assumption that Mahoning had a valid property interest under the LTV easement because that's really how it reads. But if they came back and said, look, there really is no state court property interest, then I think there would be a fair argument that Ally could make that, wait a second, the use test assumes that you have a valid property interest. They could make that argument, and maybe the Board would accept that. On the other hand, I think there would be an argument, and I don't want to get out in front of the Board here because I don't think the Board has addressed this precise question. It's possible that the Board could follow the lead of the Supreme Court in Thompson v. Texas-Mexican Railway and say that the interests of interstate commerce are so important that you can't kick them off the line, even if they don't at this point have a valid property interest. Even if they did that, though, however, that would still, what the Supreme Court said in the Tex-Mex case was that the law would imply a contractual right to use the property and the landowner could get compensation. That case was a little different because the use started way back, way back before you needed Board authority, and it involved a lease, but it was still a case where the lease was terminated according to its terms, and the Supreme Court said, no, you can't kick them off. You can't stop them from operating without ICC authorization. Did you say in the course of that answer that it's conceivable that the Board, in further proceedings, might hold that a lack of authorization creates an exception to the use doctrine for purposes of the Board's jurisdiction? I'm saying, yeah, this issue has not been addressed. Okay, but, I mean, that seems really strange to me. I mean, jurisdiction is the power to decide something, right? And you're here saying the Board has the power to decide because of the use doctrine. And asking us to say the same. And you're suggesting that we could say that, and then it goes back to the Board, and the Board says, well, actually, there's an exception to this doctrine that the Sixth Circuit said we had jurisdiction under, and so we don't have jurisdiction anymore. That just suggests to me that the basis for all this is a little shaky. I mean, like we're kind of making this up as we go along, you know? Well, I mean, I'm just trying to hold that out as a... No, and I truly appreciate your candor. I mean, I... But, like, so in your brief you say that, you know, this use test is longstanding and judicially affirmed, and we have a 1966 Sixth Circuit case. Does that case, I have to confess I haven't read it. I'm certainly going to. Does that case squarely adopt this doctrine in the manner that you're advocating it today? I know it was 50 years ago, that case. That case, yes, Your Honor. I think that case does talk about the use, you know, approve the use test. What I'm struggling here with is that I don't think it involves the situation that Judge White was talking about. So, I mean... Yeah, no, I understand. And one last question for me, and I'll relent. Mainline track and accepted ancillary track are, I guess, two questions. I don't have it in front of me. Are those terms used in Sections 10-901 or 902? No, the term is rail line. Okay, so they're a gloss. Are they defined in regulations promulgated by the Board? I don't believe so, Your Honor. So, I mean, it's just unusual. You know, I mean, this is all just sort of this, like, nebulous stuff around a really vague word. Okay, that's all right. That's helpful. I'm just trying to get my bearings. Any further questions? We were all pretty excited to talk about this railroad stuff, I have to confess. So, all right, well, thank you, Mr. Light, and we'll hear from Mr. Hockey. Thank you. Good morning. May it please the Court, my name is Eric Hockey. I'm here on behalf of the Intervenor Railroads, which we'll refer to as Mahoning or MVRY in the course of this. And I am excited to be here, as you are to have us here, obviously. I want to go a little sideways from what I was going to talk about, but to address a couple of points that were raised by the prior counsel and in your questioning. One, this question of private track and whether this is private track and whether Allied ever allowed other service to be performed, I think is a bit of a red herring. Private track being defined as track used exclusively by the owner to serve its own purposes, on the east of the Center Bridge property, Allied gave an easement to allow somebody else to use the tracks. It's not exclusively for its own purposes. It may have retained rights to use the tracks, but it's not for its exclusive purposes. There's at least two people using it. So I really don't think that that's private track. As Mr. Streeter said, Allied really didn't have a problem when it bought the property in 93 with how the property was being used at that time. It was only later when it really had a dispute with the owner of Summit, the purchaser, in 2001, and how it was using the property that it started having problems. Can you keep your voice up at the end of the sentence? Yes, I'm sorry. So what that ignores is the fact that in 1990, when Mahoning Valley entered into a trackage rights agreement with Conrail that owned a yard at the end of the tracks, it got authority from Conrail to go over those tracks to move freight from the Caslo Industrial Park, which is outside of the property, through the yard, and then take it on its tracks over the easement and out the other end all the way to the west to CSX, where it would interchange that track. So that movement and those movements for somebody other than LTV were already taking place at the time that Allied first became the owner of the property. And under whose authority were they taking place? Well, it's unclear. There was no filing, but it was happening. It very well might be that Mahoning was treating it as 10-906 ancillary switching track, in which case it would not have needed any authority at that time. Because there's no filing required for a determination of that, we don't know what their purpose was or what their interpretation was at that time. Later, when it was evidently moved, when they started moving traffic for other parties, the board has concluded that that turned it into a rail line. But it was already being used for other purposes, not for private purposes or not just for LTV at that initial time. That's my three minutes, but I'm happy to address any other questions if you have them. Questions? All right. Very well. Thank you. Appreciate the argument. You always do. No, that's fine, sir. Please, come on up. I mean, unless we told you you used it up. We were asking you questions, so that didn't count against your time. The legislative history of 10-906 is very important because up until IPTA was passed in 1996, the Interstate Commerce Commission and the STB had no jurisdiction over spur, industrial, whatever, that were located solely in one state. Now, these are solely in one state. However, Congress was concerned that they didn't want states to continue to interfere with interstate commerce. So what they did in 10-906 is that they said, okay, we're giving exclusive jurisdiction to the board to prevent, in effect, state interference with interstate operations. But at the same time, we're stripping the STB of any authority over that type of ancillary tracks. So it's kind of an ephemeral jurisdiction that's designed to ward off state interference through tort law, through things like that, but not property law and not contract law. And there are a series of Federal Circuit Court decisions that make this point very, very clear. Well, so I just want to make sure I'm following you. So you're saying in this amendment, was this 1995? Yes. That Congress gave the board jurisdiction. Just tell me again, it gave the board jurisdiction over what and it limited or took it away as to what? Here, let me get the actual wording. Yeah, I'm looking at 10-0501. I guess it's B you're probably talking about, or maybe it's part A. I don't know. Under 10906, the board does not have authority under this chapter over construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks. Now, they do have jurisdiction in what the courts and what Congress intended was simply to keep tort law. The litany of things that people try to sue railroads for is unbelievable. They wanted to keep those out of the state courts. It had nothing to do with property law or with contract law, and that's where you get the PSC case where it makes it very clear where you had contracts that were entered into years and years ago. Circumstances changed. Norfolk Southern wanted to back out. They said, oh, this is preempted. Circuit court said, yes, Your Honor. Said that was it.  I have a few more questions. Yeah, of course. So what you just said seems to come, at least for me, out of left field because it seems to have nothing to do with this issue of whether they're covered by use without a certificate. It seems to be saying something much broader, which is that, in general, this is not the kind of question that the board addresses. In effect, this is a case of first impression. Now, if you apply the Fourth Circuit case, what we're arguing is we have a right to enforce the final provision of the easement agreement. And face it, these operations had gotten to the point where they were interfering with Allied's ability to operate its own private property. If they had continued to limit their service to LTV and not store cars, we would have been happy to coexist. What we want to do now, though, is to terminate that easement. This is why Tex-Mex, the case that was just referred to by board counsel, doesn't apply because, in that case, the Supreme Court said, because there was an authorized railroad, that you can't just simply come in and take away the easement because it's part of interstate commerce. But then we get back to my basic point, which is under 10901. It says, a person may provide transportation over or by means of an extended or additional railroad line only if the board issues a certificate authorizing such activities under subsection C. But that's not a limitation of the board's jurisdiction necessarily, is it? No, it is. Somebody can't do something. It's just saying you can't operate. Right. But the question before us is strictly jurisdictional. All right. The jurisdictional issue, I have hunted for it. I can't find anything in the Act that says that the board has any jurisdiction to force Allied, which does not want to engage in for-hire railroad operations, to have its private property turned into a for-hire line. I understand. That's a level of specificity that's probably unrealistic to respect. Well, I mean, this is such a— It's a statute. I'm sorry. This is a screwball case. I mean— Okay. I'm completely confused now. I mean, this issue of their rights under the easement has not been decided, right? That is right. That's the reason I say it should go back to state court to let the state court rule. Okay. I'm sorry. What did you just say? Remember my opening comment, which I had to slow down and repeat? The board says if they do not have a certificate of public convenience necessity, then none of Allied's state law remedies are preempted, which means, as far as I'm concerned, the case should have stopped right there and they should have said, go back to state court and fight it out there and we're not going to get involved with the ancillary track or anything else. And if they'd done that, we had a clean case. We had gone back to state court and we've never met. Help me out here. What—the board has not decided their property rights, right? Okay. How is that going to get decided? The only way it will get decided is to send it back to state court because the board has admitted in case after case— Okay. But has the board said that you can't go back to state court to decide the property right? No. Okay. They haven't. And we, in fact, in the second case, we said, hey, this is improvidently granted. Send it back right now. Okay. I'm sorry. And even counsel sort of seemed to have allowed that there would be a state court decision that would then re-inform the board's decision. What is stopping you from getting this resolved in state court? We've been waiting for the board's decisions to come down and become final. And now if we affirm, you're going back to state court, right? Well, if you do, but— If we do. I'm not saying we will, but I'm saying if we affirm the board, your next stop, so to speak, is state court. The problem we have with the state of the record right now is that the board has made certain findings as to the types of tracts, et cetera, that we feel that they are erroneous. And therefore, if they go back to state court right now, we can't collaterally attack them in the state court proceeding. But what does that have to do with your contract and property rights, which are purportedly the basis of— If they're saying that they have the right through unlawful operations to continue to operate, what can the state law— But where would that come from? Where would this assertion that they have a right to continue the unlawful operations come from? I mean, basically, the only facts— I'm sorry. I'm sorry, Judge White. Go ahead.  No, no. Go ahead, Judge White. I'm sorry. I mean, the only thing that's been determined, right, is that there was a certain type of activity on the tract. All right. There are two sets of tract, one to the east of the Center Street Bridge. In that case, those were never anything other than Republic Steel sold to LTV, LTV sold to Allied. Allied owns the tracts. Allied does not want any operations performed on those tracts other than its own. If the case goes back to state court right now, you've got the imprimatur of the STB and the Sixth Circuit, perhaps, saying, oh, they can do what they want, in the face of the statute which says that the only way they can do what they want is to get a certificate beforehand. Okay, where does the opinion say they can do whatever they want? To me, it's written all over it. I guess, I mean, there's this total disconnect. I mean, this case is about jurisdiction. It's not about whether they, in fact, have the right to use the tracts. As I understand their argument, their whole argument is the board has jurisdiction regardless of whether this use is proper. If that were the way we decided this case, and I'm not trying to intimate it would be, how does that hurt your fight about whether it's an authorized use in later proceedings in state court or in front of the board? The whole point that you're focused on, they're saying they don't care about, and they're not going to, it's not part of the board's decisions, I read it. In the second, actually, what I've called decision number three, they have put certain tags on it and said these are ancillary tracts. My problem with that is where is the mainline tract where authorized operations have been authorized? There isn't any. There's no jurisdiction, period. I don't understand how that relates to my question. Well, maybe it's impossible. 10906, it says the board doesn't have jurisdiction or authority over, among other things, operation of spur, industrial, et cetera. What do you think the import of that exclusion is? The reason it was put in, as I say, was to get rid of a series of environmental cases primarily coming out of the West Coast where they were blocking the ability of the railroads to take what looked to be a line that was intrastate commerce and to prevent the big trunk lines from going ahead and doing what they wanted to do. So Congress figured the way out was to say, oh, well, we'll just give the board exclusive jurisdiction, but we're not going to give them authority. So as a result, when— Did you make a distinction between jurisdiction and authority? There is a big difference because the board, if they have authority, they could prevent Ohio Central or Mahoning Valley from selling the tracks on lot 62188 to a non-railroad. But they don't have authority. So as a result, once the state court makes the decision, they're dead. It's this whole business about you can end the operation or whatever and you don't have to get approval from the board for the spur. Okay. I'm sorry. No, not at all. Any further questions? No. All right. Well, thank you. Thank you very much. Thank you all for your arguments. A very interesting case. We'll look at it very carefully. Case to be submitted. Clerk may adjourn court.